UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

MARGARET HOMRIGHOUSE,

              Plaintiff,

v.                                           Case No.  5:08-cv-374-Oc-GRJ

MICHAEL J. ASTRUE, Commissioner of Social
Security,

              Defendant.

_____/

## <u>ORDER</u>

Plaintiff appeals from a final decision of the Commissioner of Social Security ("the Commissioner") denying her applications for a period of disability, and disability insurance benefits. (Doc. 1.) The Commissioner has answered (Doc. 4), and both parties have filed briefs outlining their respective positions. (Docs. 11 & 12.) For the reasons discussed below, the Commissioner's decision is due to be **AFFIRMED**.

## I. <u>PROCEDURAL HISTORY</u>

On June 6, 2005, Plaintiff filed applications for a period of disability and disability insurance benefits, alleging a disability onset date of June 1, 2004—which she later amended to March 9, 2005. (R. 75-77, 97, 455.) Plaintiff's application was denied initially and upon reconsideration. (R. 43-46, 53-54, 56-58.) Thereafter, Plaintiff timely pursued her administrative remedies available before the Commissioner and requested a hearing before an Administrative Law Judge ("ALJ"). (R. 52.) The ALJ conducted Plaintiff's administrative hearing on July 10, 2007. (R. 452-75.) The ALJ issued a decision unfavorable to Plaintiff on September 25, 2007. (R. 24-39.) Plaintiff's request

for review of the hearing decision by the Social Security Administration's Office of

Hearings and Appeals was denied. (R. 52.) Plaintiff then appealed to this Court. (Doc.

1.)

## II. <u>STANDARD OF REVIEW</u>

The Commissioner's findings of fact are conclusive if supported by substantial

evidence.[1] Substantial evidence is more than a scintilla in that the evidence must do

more than merely "create a suspicion of the existence of [a] fact," and must include

"such relevant evidence as a reasonable person would accept as adequate to support

the conclusion."[2]

Where the Commissioner's decision is supported by substantial evidence, the

district court will affirm, even if the reviewer would have reached a contrary result as

finder of fact, and even if the reviewer finds that the evidence preponderates against the

Commissioner's decision.[3] The district court must view the evidence as a whole, taking

into account evidence favorable as well as unfavorable to the decision.[4] However, the

district court will reverse the Commissioner's decision on plenary review if the decision

applies incorrect law, or if the decision fails to provide the district court with sufficient

---

[1] *See* 42 U.S.C. § 405(g).

[2] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Richardson v. Perales, 402 U.S. 389, 401(1971); Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982)); *accord* Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] Foote, 67 F.3d at 1560; *accord* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding court must scrutinize entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding court must also consider evidence detracting from evidence on which Commissioner relied).

reasoning to determine that the Commissioner properly applied the law.[5]  The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6] The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8] First, if a claimant is working at a substantial gainful activity, he is not disabled.[9] Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled.[10] Third, if a claimant's impairments meet or equal an impairment listed in Title 20, Part 404, Subpart P, Appendix 1 of the Code of Federal Regulations, he is disabled.[11] Fourth, if a claimant's impairments do not

_____

[5] Keeton v. Dep't Health & Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-.1511.

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. See Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

[10] Id. § 404.1520(c).

[11] Id. § 404.1520(d).

prevent him from doing past relevant work, he is not disabled.[12] Fifth, if a claimant's impairments (considering her residual functional capacity ("RFC"), age, education, and past work) prevent him from doing other work that exists in the national economy, then he is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[14] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[15] The Commissioner may satisfy this burden by pointing to the grids for a conclusive determination that a claimant is disabled or not disabled.[16]

However, the ALJ should not exclusively rely on the grids when the claimant has a non-exertional impairment which significantly limits her or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion.[17] In a situation where both exertional and non-exertional impairments are

---

[12] 20 C.F.R. § 404.1520(e).

[13] Id. § 404.1520(f).

[14] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); see also Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[15] Doughty, 245 F.3d at 1278 n.2.
In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.
Id. (internal citations omitted).

[16] Walker, 826 F.2d at 1002. Once the burden shifts to the Commissioner to show that the claimant can perform other work, the grids may come into play. Id.

[17] Phillips v. Barnhart, 357 F. 3d 1232, 1243 (11th Cir. 2004); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Walker, 826 F.2d at 1003 ("The
(continued...)

found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[18]

The ALJ may use the grids as a framework to evaluate vocational factors so long as the ALJ introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[20] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.[21]

## III. <u>SUMMARY OF THE RECORD EVIDENCE</u>

Plaintiff was sixty (60) years old at the time of the ALJ's decision on September 25, 2007. (R. 27-39, 75.) She has a high school education with one year of college, and has previous work experience as a certified nursing assistant, an expediter, a cashier and a waitress. (R. 89, 95, 101.) Plaintiff contends that she has been unable to work since March 9, 2005[22] due to autoimmune hepatitis, fibromyalgia, and depression. (R. 75, 88, 100.) Plaintiff was insured for benefits through March 31, 2005. (R. 71, 95.)

---

[17](...continued)
grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[18] <u>Walker v. Bowen</u>, 826 F.2d 996, 1003 (11th Cir. 1987).

[19] <u>Wolfe v. Chater</u>, 86 F.3d 1072, 1077-78 (11th Cir. 1996).

[20] *See* <u>id</u>.

[21] *See* <u>Doughty v. Apfel</u>, 245 F.3d 1274, 1278 n.2 (11th Cir. 2001).

[22] Plaintiff amended her alleged onset of disability date from June 1, 2004 to March 9, 2005 during her hearing before the ALJ. (R. 75-77, 455.)

In the ALJ's review of the record, including Plaintiff's testimony, medical records from several health care providers, and testimony from a vocational expert ("VE"), the ALJ determined that Plaintiff suffers from autoimmune hepatitis. (R. 29.) While this impairment is severe, the ALJ determined that Plaintiff did not have an impairment or combination of impairments which met or medically equaled one of the impairments listed in Title 20, Part 404, Subpart P, Appendix 1 of the Code of Federal Regulations. (R. 29-31.)

The ALJ then found that Plaintiff retained the RFC to perform the exertional demands of the full range of light work. (R. 36.) After finding that Plaintiff could perform her past relevant work as a waitress, a cashier, and an expediter as the work is actually and generally performed, the ALJ concluded that Plaintiff was not disabled. (R. 38-39.)

Plaintiff raises four issues in her appeal all of which pertain to her autoimmune hepatitis and fibromyalgia. The Court will limit its discussion of the medical records accordingly.

Medical evidence for the relevant time period—including treatment notes generated during the months just before Plaintiff's alleged onset of disability date and just after her date last insured [hereinafter "the relevant time period"]—is limited and includes medical records from Plaintiff's treating physicians, Dr. Mariananda Kumar, Dr. Johannes Martensson, and medical records corresponding to surgery that took place at Munroe Regional Medical Center in March 2005. The evidence for the relevant time period reveals the following:

Treatment notes from Plaintiff's treating physician, Dr. Kumar, documenting Plaintiff's visits on December 2004, March 2005, and May 2005 do not appear to note any subjective complaints of pain or fatigue nor do they appear to reference Plaintiff's fibromyalgia condition as an "active" problem.[23] In December 2004, Dr. Kumar noted abnormal liver function test results. (R. 251-54.)

Pursuant to the abnormal liver function testing results, Plaintiff was seen by Dr. Johannes Martensson for treatment in February 2005. Dr. Martensson discussed the recent test results and noted that Plaintiff's prescription for Celebrex had been discontinued and changed to Mobic. According to Dr. Martensson, Plaintiff took Mobic for relief of pain associated with arthritis in her back and hips. Although Plaintiff complained of discomfort in her upper right quadrant for the past month that had been progressively getting worse, examination revealed tenderness only upon palpation of her right upper quadrant (Plaintiff did not experience pain when pressure was not being applied to the area). (R. 317.) He recommended that Plaintiff undergo further testing to determine whether she may be suffering from inflammation of the gall bladder and, if so, he opined that she may be a candidate for surgery to remove her gall bladder. (R. 319.) Dr. Martensson's treatment note did not discuss any symptoms or clinical findings related to Plaintiff's fibromyalgia. In fact, the only mention Dr. Martensson made of Plaintiff's fibromyalgia was a brief reference to it in his summary of her medical history. (R. 317.)

---

[23] The Court's review of Dr. Kumar's treatment notes was complicated by the fact that they were handwritten and predominantly written in shorthand.

Plaintiff reported to the Munroe Regional Medical Center on March 9, 2005 for gall bladder removal and a liver biopsy pursuant to her biliary colic and elevated liver enzyme levels. (R. 174-86.) Dr. William Overcash conducted a pre-operative examination of Plaintiff which was unremarkable. On March 11, 2005, Plaintiff returned for a follow up visit and Dr. Overcash noted that Plaintiff's liver biopsy revealed possible autoimmune hepatitis.

Plaintiff returned to see Dr. Martensson for a follow up visit on March 24, 2005. At that time, Dr. Martensson noted that further testing revealed that Plaintiff had chronic inflammation of her gall bladder and possible autoimmune hepatitis. He noted that she was "feeling pretty well." (R. 316.) Dr. Martensson recommended further testing to confirm whether she has autoimmune hepatitis. (R. 316.) When Plaintiff returned for a follow up visit in April, Dr. Martensson noted that the testing revealed antibodies which suggested a diagnosis of type II autoimmune hepatitis. Accordingly, Dr. Martensson prescribed Imuran and Prednisone to treat the condition. He noted that his treatment plan was to taper off Plaintiff's prescriptions over the course of three weeks and then recheck her blood testing "in four and eight weeks to be sure no bone marrow depression develops." (R. 315.)

The first time that Plaintiff's subjective complaints of pain and/or fatigue due to fibromyalgia appear in Dr. Martensson's treatment notes is in a treatment note from June 2005. In it, Dr. Martensson simply notes that Plaintiff "has some muscle pain in the legs (fibromyalgia)." (R. 314.)

Most of the medical evidence pertaining to treatment of Plaintiff's fibromyalgia falls well outside of the time period in which she alleges she was disabled. The records either predate her alleged onset of disability by several years or they were generated several months after Plaintiff's date last insured.

According to the medical evidence of record, Plaintiff has had a diagnosis of fibromyalgia since at least April 2002. (R. 37, 166-68, 191-92, 194, 269-70, 300, 303, 337, 340, 342.) Although Plaintiff's treating physician notes the possibility that Plaintiff may have fibromyalgia in April 2002, none of her subsequent treatment notes dated August 2002 through December 2004 appear to mention any sort of treatment for fibromyalgia. (R. 253-68.) In fact, Dr. Kumar saw Plaintiff during the relevant time period and her corresponding treatment note did not mention fibromyalgia—nor did it note subjective complaints such as pain or fatigue. (R. 252.)

Plaintiff was referred to Dr. Farrukh Zaidi by her treating physician, Dr. Kumar. (R. 270.) During Plaintiff's initial consultation with Dr. Zaidi in August 2002, she reported total body pain and worsening symptoms with physical activity, constant fatigue, and difficulty sleeping. Examination revealed slight pain with abduction of shoulders and diffuse tenderness of the thoracic spine with decrease in flexion and multiple fibrostatic tender points. She was diagnosed with symptoms consistent with fibromyalgia and hypothyroidism. (R. 197-98.) Plaintiff continued treatment with Dr. Zaidi for fibromyalgia between December 2002 and February 2003. (R. 190, 194.) After Plaintiff's February 2003 visit, she did not return for treatment with Dr. Zaidi until July 2005. (R. 188.)

In the interim, Plaintiff saw her treating gastroenterologist, Dr. Rodwan Hiba, in October 2003, and advised that notwithstanding her chronic history of mitral valve prolapse, osteoarthritis, hypertension, and fibromyalgia, she was doing "extremely well" and was "very happy about her current condition." (R. 166.)

On June 13, 2005, Plaintiff presented to Dr. Kumar with complaints of leg cramps and pain that worsens with walking. She reported no numbness or tingling in her lower extremities. Notably, Dr. Kumar's treatment note lists degenerative joint disease and autoimmune hepatitis as active problems, but does not list fibromyalgia. (R. 250.)

Plaintiff returned to Dr. Zaidi for treatment in July 2005 complaining of joint and muscle pain. (R. 188.) Dr. Zaidi noted that he had not seen Plaintiff in three years and that Plaintiff "was doing well" on Celebrex. Plaintiff advised Dr. Zaidi that, upon being diagnosed with autoimmune hepatitis, she was taken off of Celebrex and prescribed Mobic. According to Plaintiff, "since then, she feels much worse." (R. 188.) Plaintiff reported "achiness" mild to moderate in intensity in her thighs and calves which is generally worse with standing or walking. Plaintiff reported no significant pain in her upper extremities. She also reported experiencing fatigue. (R. 188.) Examination revealed Plaintiff had a normal gait and grip strength. She had full range of motion in her wrists, shoulders, hips, knees, and ankles. Dr. Zaidi noted that Plaintiff was non-tender in her wrists, elbows, shoulders, and ankles. There were "scattered fibrositic tender points noted" in her feet. Dr. Zaidi's impression was that Plaintiff was presenting with muscle pain that could be attributable to either a flare up of her fibromyalgia or symptoms associated with a medication she takes to lower her cholesterol. Dr. Zaidi

recommended that Plaintiff get back on Celebrex and advised her to return in three months for a follow up visit. (R. 188.) Dr. Zaidi also prepared a medical source statement in which he opined that, although Plaintiff "does have decrease in flexion of [her] spine," she demonstrates "no sensory or motor changes." Her grip strength and gait were noted to be intact. Although Dr. Zaidi opined that Plaintiff was unable to squat, walk on her toes, or walk on her heels, he further opined that an assistive device was not medically necessary for ambulation. (R. 187.)

At the request of the Social Security Administration, Plaintiff reported to Dr. Thomas Hibbard, a psychologist, for a consultative examination on September 14, 2005. (R. 219-22.) Plaintiff described her history of autoimmune hepatis and stated she was unable to work as a certified nursing assistant because she could not be exposed to infections due to her autoimmune hepatitis. She also advised that she had fibromyalgia. According to Plaintiff, she was unable to do repetitive motions associated with activities like sweeping or ironing and reported pain with bending. (R. 219-22.)

Between November and December 2005, Plaintiff saw Dr. Thomas Lafferty, a rheumatologist, for treatment of her fibromyalgia. (R. 307-11, 330.) Plaintiff presented with complaints of achiness and morning stiffness in her legs, and arthritis in her back. Examination revealed tenderness upon palpation of her spine and 15 out of 18 fibromyalgia tender points. Dr. Lafferty diagnosed her with fibromyalgia, degenerative disc disease of the lumbar spine, leg pain and autoimmune hepatitis. He adjusted her medications. Plaintiff's fibromyalgia symptoms reportedly worsened in September 2006. (R. 437-38.) Dr. Lafferty continued to treat Plaintiff's ongoing symptoms. (R. 374-79.)

On March 8, 2007, nearly two years after Plaintiff's date last insured, Dr. Lafferty completed a medical source statement in which he opined Plaintiff could only lift and/or carry less than ten pounds, stand and/or walk less than two hours in an eight-hour day, and sit about two hours of an eight-hour day. He further opined that she was capable of sitting fifteen minutes before she would need to change positions and standing ten minutes before she would need to change positions. He also opined that she would need to lay down at unpredictable intervals, about every one to two hours due to arthritis in her lumbar spine. According to Dr. Lafferty, Plaintiff could never stoop, crouch, or climb stairs and/or ladders, and Plaintiff's impairments limit her ability to reach, push and pull due to arthritis in her shoulders. He advised that Plaintiff used a cane to ambulate and reported that she used a wheelchair when grocery shopping. Lastly, he noted that she would likely be absent from work more than three times a month due to her impairments. (R. 386, 395-96.)

On July 3, 2007, Dr. Martensson prepared a medical source statement in which he opined that Plaintiff was capable of lifting and carrying ten pounds occasionally and less than ten pounds frequently. According to Dr. Martensson, Plaintiff could only stand and walk about two hours with normal breaks and it was unclear to Dr. Martensson how long Plaintiff was able to sit or stand before she would need to change positions. He opined that Plaintiff might have to lay down at unpredictable intervals and that she should not be exposed to liver toxins or infections due to her autoimmune hepatitis. According to Dr. Martensson, Plaintiff has had these limitations since January 2005. Dr.

Martensson noted that he treated Plaintiff for autoimmune hepatitis and gastritis, but he did not mention that he was treating her for fibromyalgia. (R. 425-27.)

During the hearing on July 10, 2007, Plaintiff testified that she is disabled as a result of fibromyalgia and autoimmune hepatitis. (R. 459.) According to Plaintiff, due to fibromyalgia, she experiences severe pain in her legs, feet, shoulder with generalized pain all over her body. As a result of her shoulder pain, she testified that, during the relevant time period she was unable to hold her hand above her head and was capable of lifting less than ten pounds. (R. 459, 463-64.) Due to pain in her legs and feet, she testified that she could not sit for more than ten to fifteen minutes at a time, she could only stand for ten minutes at a time and she was capable of walking for five to ten minutes at a time. (R. 463-64.) She uses a cane to walk, but the cane was not prescribed by a doctor. (R. 461.) In addition, she testified that she needed to lie down for a couple of hours at a time during the day. (R. 464.) Plaintiff also testified that, during the relevant time period, her hand pain interfered with her ability to grip things. (R. 465.) She testified that hepatitis causes her to be very lethargic and fatigued. (R. 460.)

With respect to her activities of daily living during the relevant time frame, Plaintiff testified that she was able to drive a car, and although it causes her pain - she vacuums, mops, and helps her husband cook. (R. 456, 460-61.) She also testified that she is able to care for her personal hygiene although she has difficulty curling her hair because it requires her to lift her arms above her shoulders. (R. 460-61.) Plaintiff testified that, during the relevant time period, she attended church, and could occasionally bowl or golf. (R. 461-62.)

With respect to her medications, Plaintiff testified that between March 9, 2005 and March 31, 2005, she was taken off of the drugs that she had been taking to treat her fibromyalgia due to her diagnosis with hepatitis. (R. 459.) According to Plaintiff, her medications give her relief from the pain associated with her arthritis, but not her fibromyalgia pain. (R. 460.)

When questioned about her duties as an expediter clerk, Plaintiff testified that the job entailed lifting and carrying of inventory which normally weighed less than ten pounds. (R. 462-63.) She further testified that a majority of the job was done while sitting. However, she explained that she did have to stand and walk on occasion as part of her duties as an expediter. (R. 466-67.)

## IV. DISCUSSION

**A.    The ALJ properly considered Plaintiff's fibromyalgia.**

Plaintiff argues that the ALJ erred in failing to explain why she did not find fibromyalgia to be a severe impairment at step two of the sequential analysis. At step two of the sequential analysis, the burden is on Plaintiff to demonstrate the existence of a severe impairment or combination of impairments[24] which significantly limit or could be

_____

[24] Impairments that are successive but unrelated may not be combined to satisfy the twelve month requirement. Soc. Sec. Admin. Rul. 82-52.

expected to significantly limit her physical ability to perform basic work activities[25] for a full twelve month period.[26]

Specifically, Plaintiff contends that the ALJ's failure to find fibromyalgia was even a minimally severe impairment at step two means that the ALJ failed to meaningfully evaluate the combined effect of Plaintiff's autoimmune hepatitis and fibromyalgia along with the corresponding impact of those conditions on Plaintiff's functioning.

In opposition, the Commissioner points out that, "the ALJ could not have committed any error at step two because he found that [Plaintiff] had a severe impairment . . . and moved on to the next step in the evaluation, which is all that is required at step two."[27] The ALJ concluded that Plaintiff's autoimmune hepatitis constituted a "severe" impairment at step two of the sequential analysis and proceeded to step three. While it would have been better had the ALJ made an explicit finding as to the severity of Plaintiff's fibromyalgia for the sake of clarity, nonetheless, it is apparent that the ALJ considered all of Plaintiff's alleged symptoms—including her pain and fatigue—in making her decision. Indeed, the ALJ's thorough and extensive summary of the medical evidence of record references Plaintiff's fibromyalgia no less than ten times. (R. 31, 33-35.)

---

[25] Basic work activities include: "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling; seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment, responding appropriately to supervision, coworkers, and usual work situations; and dealing with changes in a routine work setting." Soc. Sec. Admin. Rul. 85-28.

[26] 20 C.F.R. § 404.1520(c).

[27] (Doc. 12 p. 5) (quoting Council v. Barnhart, 127 Fed. Appx. 473, No. 04-13128, slip op. at 4 (11th Cir. Dec. 28, 2004) (table)); *see also* Perry v. Astrue, 280 Fed. Appx. 887 (11th Cir. 2008).

In addition, the ALJ's discussion of Plaintiff's fibromyalgia acknowledges that the medical evidence alludes to the interplay between Plaintiff's fibromyalgia and autoimmune hepatitis and the corresponding impact on Plaintiff – including the changes in her medications prompted by the concurrence of both medical conditions. (R. 31, 34-35.)

To the extent that Plaintiff argues that the ALJ's decision does not make it clear whether the ALJ considered Plaintiff's impairments in combination in making her disability determination, the Court finds that the ALJ's written decision properly addressed Plaintiff's impairments in accord with Eleventh Circuit law.

Where a claimant alleges more than one impairment, the Commissioner has a duty to consider the cumulative effects of the impairments in making the determination as to whether the claimant is disabled.[28] According to the Eleventh Circuit, this burden is met where the ALJ expressly states that she has considered all of the medical evidence and concludes that Plaintiff is not suffering from "an impairment, or a combination of impairments listed in Appendix 1, Subpart P."[29]

In this case, the ALJ thoroughly summarized the medical evidence concerning Plaintiff's various alleged impairments—including her diagnosis of fibromyalgia—and concluded that Plaintiff's autoimmune hepatitis constituted a "severe" impairment at step two of the sequential analysis. (R. 29-36.) At step three of the sequential analysis, the

_____

[28] Jones v. Dep't of Health & Hum. Servs., 941 F.2d 1529, 1533 (11th Cir. 1991) (citing Hudson v. Heckler, 755 F.2d 781, 785 (11th Cir. 1985), aff'd on other grounds, Sullivan v. Hudson, 490 U.S. 877 (1989)).

[29] Id.

ALJ concluded that, "[t]hrough the date last insured, [Plaintiff] did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1." In making this finding, the ALJ noted that the medical evidence of record revealed no "findings equivalent in severity to the criteria of any listed impairment, individually, or in combination. In her assessment of Plaintiff's RFC, the ALJ stated that Plaintiff's RFC was based upon her "careful consideration of the entire record" as well as "all symptoms and the extent to which [they] can reasonably be accepted as consistent with the objective medical evidence and other evidence." (R. 36.) Accordingly, consistent with Eleventh Circuit precedent, these statements by the ALJ are more than sufficient to demonstrate that she properly considered Plaintiff's impairments in combination.[30]

Thus, although the ALJ did not explicitly list fibromyalgia as a severe impairment at step two of the sequential analysis, her decision—which included an extensive summary of the medical evidence of record—demonstrates that she fully considered Plaintiff's diagnosis of fibromyalgia as well as the extent that it could be expected to have impacted Plaintiff's ability to work during the relevant time period.

---

[30] *See e.g.*, Nigro v. Astrue, No. 8:06-cv-2134-T-MAP, 2008 WL 360654, at *2 (M.D. Fla. Feb. 8, 2008).

Even if it might have been a better practice for the ALJ to make more explicit findings regarding the severity or non-severity of the Plaintiff's other impairments, the ALJ thoroughly discussed the evidence relating to all of the Plaintiff's impairments and took the combination of the Plaintiff's impairments into account in determining her residual functional capacity.

**B.    The ALJ properly evaluated opinions of Plaintiff's treating physicians**.

Plaintiff also contends that the ALJ committed reversible error in failing to articulate adequate reasons for discrediting the opinions of two treating physicians – Dr. Johannes Martensson and Dr. Thomas Lafferty.

In opposition, the Commissioner argues that the ALJ properly considered the opinions of both Dr. Martensson and Dr. Lafferty and her decision to give "little weight" to each opinion is supported by substantial evidence. The Court agrees.

A treating physician's opinion is entitled to controlling weight only when it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record."[31] Nonetheless, substantial or considerable weight must be given to the opinion, diagnosis, and medical evidence of a treating physician unless "good cause" is shown to the contrary.[32]

The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.[33]  Where a treating physician has merely made conclusory statements, the

---

[31] 20 C.F.R. § 404.1527(d)(2).

[32] Crawford v. Comm'r of Soc. Sec., 363 F. 3d 1155, 1159 (11th Cir. 2004) (citing Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir.1997)) ("We have found 'good cause' to exist where the doctor's opinion was not bolstered by the evidence, or where the evidence supported a contrary finding. We have also found good cause where the doctors' opinions were conclusory or inconsistent with their medical records."); see also Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir. 1991); Sabo v. Comm'r of Soc. Sec., 955 F. Supp. 1456, 1462 (M.D. Fla.1996); 20 C.F.R. § 404.1527(d).

[33] Edwards, 937 F.2d at 584 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.[34]

Upon a review of the ALJ's decision, as well as an examination of the medical records at issue, the Court finds that the ALJ properly considered the opinion of Dr. Martensson and articulated good cause for discounting Dr. Martensson's July 2007 assessment regarding Plaintiff's functional limitations.

In discounting Dr. Martensson's opinion, the ALJ noted that Dr. Martensson's treatment notes from January 2005 through December 2005 did not contain any clinical findings to support his subsequent opinion rendered over two years later concerning Plaintiff's residual functional capacity during the relevant time period. In fact, the ALJ points to objective findings contained within Dr. Martensson's own treatment notes that are inconsistent with his later retroactive assessment of Plaintiff. For example, the ALJ notes that Dr. Martensson's treatment of Plaintiff during the relevant time period was relatively conservative and that none of the treatment notes during that time frame assign any sort of limitations attributable to Plaintiff's medical conditions nor do they note symptoms so serious as to support the functional limitations Dr. Martensson later found nearly two years after the fact. Instead, the treatment notes for the relevant time period demonstrate that Plaintiff's autoimmune hepatitis seemed (at that time) to be stabilizing.

---

[34] Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir.1986); *see also* Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir.1987).

Also, although not determinative of the issue, Dr. Martensson's opinion is further devalued by the fact that it assigns limitations resulting from Plaintiff's fibromyalgia and arthritis despite the fact that Dr. Martensson expressly acknowledged that fibromyalgia and arthritis are outside of his specialty.[35]

In sum, the ALJ's decision to discount Dr. Martensson's opinion was justified by the fact that Dr. Martensson's treatment notes did not reflect any clinical findings or subjectively reported symptoms consistent with a totally disabling condition, his treatment of Plaintiff was conservative in nature, and fibromyalgia is not within his area of specialty (as he acknowledged in his medical source statement).[36]

With respect to the Plaintiff's argument regarding Dr. Lafferty, substantial evidence supports the ALJ's decision to give little weight to the opinion of Dr. Lafferty and the ALJ sufficiently articulated her reasons for doing so. Although he was Plaintiff's treating physician as of November 2005, Dr. Lafferty did not examine Plaintiff during the relevant time period. In fact, Dr. Lafferty did not treat Plaintiff until well after the date she was last insured. Thus, any opinion Dr. Lafferty may have had concerning Plaintiff's functional capacity during the relevant time period necessarily was speculative[37] and, although relevant, certainly less probative than medical evidence generated closer in

---

[35] The appropriate weight to be given a treating physician's opinion is a function of many factual considerations. *See* 20 C.F.R. § 404.1527(d)(2). Furthermore, the Commissioner "generally give[s] more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." Id. § 404.1527(d)(5).

[36] *See e.g.*, Elder v. Astrue, 529 F.3d 408 (7th Cir. 2008) (physician not a specialist in fibromyalgia).

[37] Malak v. Astrue, 246 Fed. Appx. 482 (9th Cir. 2007) (finding retrospective opinion of physician was necessarily conclusory and speculative where he did not treat Plaintiff until after expiration of DLI).

time to Plaintiff's date last insured.[38] The ALJ's opinion makes it clear that, although she did consider all of the medical evidence of record—including Dr. Lafferty's treatment notes and medical source statement—the ALJ's assessment of Plaintiff's RFC focused on those records that were most relevant to Plaintiff's condition during the relevant time period. (R. 30, 36, 37, 38, 39.) Dr. Lafferty's opinion concerning Plaintiff's residual functional capacity was dated March 2007 and does not explicitly state that it was intended to relate back to Plaintiff's condition two years prior nor does it even reference fibromyalgia. In fact, although Dr. Lafferty did treat Plaintiff for fibromyalgia, the only medical conditions listed on Dr. Lafferty's residual functional capacity assessment are arthritis and autoimmune hepatitis.

Finally, and most importantly – as expressly stated by the ALJ, Dr. Lafferty's opinion is inconsistent with the medical evidence of record *for the relevant time period*. Dr. Lafferty's assessment that Plaintiff was capable of less than the full range of sedentary work is an opinion of Plaintiff's functional limitation in March 2007 and not during the relevant time period. However, eEven assuming Dr. Lafferty's assessment was intended to render an opinion of Plaintiff's capacity to work during the relevant time period, none of the medical evidence of record immediately preceding Plaintiff's alleged onset of disability, during, or immediately following her date last insured support such an extreme and conclusory opinion.

---

[38] *See e.g.*, Anderson v. Schweiker, 651 F.2d 306, 310 n.3 (5th Cir. 1981) (finding treating doctor's opinion was relevant "only for the light it sheds, if any, on [Plaintiff's] condition as it existed" prior to Plaintiff's date last insured); Brown v. Astrue, No. 09-40094, 2009 WL 2776602, at *3-4 (5th Cir. Sept. 2, 2009) (questioning appropriate weight to be given to the retrospective opinion of physician who first treated Plaintiff after the expiration of his date last insured); Cohen v. Astrue, 258 Fed. Appx. 20, (7th Cir. 2007) (finding ALJ properly discounted retrospective opinion of treating physician where it was inconsistent with medical evidence produced closer in time to the date last insured).

Thus, although the medical evidence generally supports Dr. Lafferty's assessment of Plaintiff the opinion establishes only that Plaintiff's condition deteriorated *after* the expiration of her insured status. Dr. Lafferty's opinion does not, however, refute the fact that there is substantial evidence in the record supporting the ALJ's determination that Plaintiff was not disabled *prior to* the expiration of her insured status. Accordingly, Dr. Lafferty's opinion that Plaintiff was incapable of less then a full range of sedentary work is inconsistent with the medical evidence of record *for the relevant time period*.[39]

## C. The ALJ properly considered Plaintiff's subjective complaints.

Plaintiff also argues that the ALJ failed to properly evaluate Plaintiff's subjective complaints of pain and fatigue. In evaluating a disability, the ALJ must consider all of a claimant's impairments, including her subjective symptoms, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.[40] Where, as here, an ALJ decides not to credit a claimant's testimony about subjective complaints concerning the intensity, persistence and limiting effects of symptoms, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.[41] A reviewing court will

---

[39] *See* Demandre v. Califano, 591 F.2d 1088, 1090 (5th Cir. 1979); *see also* Cohen v. Astrue, 258 Fed. Appx. 20 (7th Cir. 2007) (even if physician who began treating Plaintiff long after DLI was a "treating physician," opinion was not entitled to great weight to the extent it was inconsistent with other substantial medical evidence, particularly evidence produced by other physicians near the DLI).

[40] 20 C.F.R. § 404.1528.

[41] Foote v. Chater, 67 F.3d at 1561-62; Jones v. Dep't of Health & Hum. Servs., 941 F.2d 1529, 1532 (11th Cir. 1991) (finding that articulated reasons must be based on substantial evidence).

not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.[42]

The ALJ articulated specific reasons for rejecting Plaintiff's credibility as to the limiting effects of her symptoms, which reasons are supported by substantial evidence in the record. First, and as noted by the ALJ, Plaintiff's activities of daily living *during the relevant time period* were inconsistent with a totally incapacitating condition. Plaintiff's self-reported activities of daily living, though not conclusive,[43] are inconsistent with the severity and duration of Plaintiff's alleged pain and fatigue. For example, she testified that, during the relevant time period, she vacuumed, mopped, attended church, and cared for her dogs. She also advised that she occasionally bowled and golfed. During a consultative examination, Plaintiff reported that she was capable of caring for her own personal hygiene, did housework, and helped her husband with cooking. During an office visit with her treating physician, she advised that she was able to travel to New York. According to her testimony, she is capable of driving a car. Such activities are inconsistent with her testimony that she was only able to sit for no more than 10-15 minutes at a time, stand for ten minutes at a time, walk for five to ten minutes at a time and lift less than ten pounds. (R. 463-64.) The reported activities also undermine her testimony that she has hand pain that interferes with her ability to grip things. (R. 465.) Also, most of Plaintiff's self-reported limitations in her activities do not appear to relate

_____

[42] Hale v. Bowen, 831 F.2d 1007, 1012 (11th Cir. 1987); MacGregor v. Bowen, 786 F.2d 1050, 1054 (11th Cir. 1986).

[43] The crux of the Court's inquiry is whether Plaintiff is able to engage in gainful employment—not whether he engages in "sporadic or transitory activity." *See* Early v. Astrue, 481 F. Supp. 2d 1233, 1239 (N.D. Ala. 2007) (citing Smith v. Califano, 637 F.2d 968 (3d Cir. 1981); Easter v. Bowen, 498 F.2d 956 (8th Cir. 1974)).

specifically to the limitations Plaintiff actually experienced between the date she alleged onset of her disability and the date she was last insured. Instead, the problems appear to have an origin months after the fact.

Although Plaintiff alleges that her pain and fatigue were incapacitating during the relevant time frame, her medical records for that period of time do not support her subjective complaints. Pain and fatigue are symptoms that *may* cause functional limitations. However, allegations of pain and fatigue must be considered with the other evidence in the record to determine the extent to which they impact a claimant's ability to perform work related activities.[44] Here, the ALJ found Plaintiff's medical impairments and the resulting symptoms—including her pain and fatigue—limited Plaintiff to the exertional demands of light work during the relevant time period. (R. 36.)

In reaching this finding, the ALJ relied on medical evidence that was generally unremarkable during the relevant time period. For example, Plaintiff was seen by her treating physician after her alleged onset of disability and prior to her date last insured, but she did not report any subjective complaints of pain or fatigue during those visits. (251-54, 317, 319.) In addition, fibromyalgia was not listed as among Plaintiff's "active" problems. (R. 251-54.) To the contrary, Dr. Martensson noted on March 24, 2005 that Plaintiff was feeling "pretty well." (R. 316.)

And despite the fact that Plaintiff was diagnosed with fibromyalgia in 2002, she discontinued treatment with Dr. Zaidi – the physician who diagnosed her fibromyalgia – until after her date last insured in July 2005. In addition, after being diagnosed with

---

[44] 20 C.F.R. § 404.1528(a), .1529(a), .1545(a).

fibromyalgia, Plaintiff worked for some time as a CNA, which reportedly involved physical exertional demands of "heavy work." (R. 90.) Moreover, with respect to the treatment notes produced between December 2004 and June 2005, the first time Plaintiff's complaints of pain or fatigue appear is in a treatment note from Dr. Martensson in June 2005 in which he merely noted that Plaintiff "has some muscle pain in the legs (fibromyalgia)." The note does not suggest any limitations associated with the complaint nor does it discuss any proposed treatment. (R. 314.) Lastly, the ALJ did not reject Plaintiff's subjective testimony outright. Instead, the ALJ acknowledged that Plaintiff's impairments *could* produce pain and limitations—just not of the severity claimed by Plaintiff. I

In sum, the ALJ determined that Plaintiff's combined activities of daily living were inconsistent with Plaintiff's allegations of incapacitating limitations due to pain and fatigue. Accordingly, for these reasons, the Court concludes that the ALJ articulated specific and adequate reasons, which are fully supported by the evidence of record, for finding Plaintiff's subjective complaints were not fully credible. As such, the ALJ did not err in her assessment of Plaintiff's RFC.

**D.      The ALJ did not err in finding Plaintiff capable of performing past relevant work.**

Lastly, Plaintiff argues that the ALJ improperly found her past relevant work to include her experience as a cashier and as a waitress because she did not earn the requisite amount of money to meet the minimum requirements for engaging in substantial gainful activity ("SGA"). However, as pointed out by the Commissioner, this

argument lacks merit because the ALJ also found Plaintiff capable of performing her past relevant work as an expediter clerk. (R. 38.) Plaintiff's testimony during the hearing, as well as her description of the job in her correspondence with the Social Security Administration discloses that the position of "expediter" as it was actually performed required the exertional demands of no more than sedentary work. Because the ALJ found Plaintiff capable of light work and such a determination is supported by substantial evidence, Plaintiff failed to meet her burden of proving that she was incapable of performing her past relevant work prior to the expiration of her insured status.

## V. <u>CONCLUSION</u>

In view of the foregoing, the decision of the Commissioner is **AFFIRMED**. The Clerk is directed to enter final judgment in favor of the Commissioner consistent with this Order and close the file.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on September 18, 2009.

GARY R. JONES
United States Magistrate Judge

Copies to:
      All Counsel